**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRCIT OF TEXAS**
**SHERMAN DIVISION**

---

FABIAN THOMPSON

                Plaintiff                CASE NO.

                                      **JURY TRIAL DEMANDED**

v.

EXPERIAN INFORMATION SOLUTIONS,
INC., EQUIFAX INFORMATION
SERVICES, LLC, TRANS UNION, LLC,
AFFIRM, INC., and GOLDMAN SACHS
BANK USA

                Defendants

---

## COMPLAINT

NOW COMES Plaintiff, Fabian Thompson (hereinafter the "Plaintiff"), by and through their counsel of Record to make their allegations known against the Defendants through their complaint that alleges the following:

## PRELIMINARY STATEMENT

1.  This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees pursuant to 15 U.S.C. §1681 et seq. (Fair Credit Reporting Act).

2.  Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to Plaintiff or Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

1

3.  While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

4.  All violations by the Defendants were knowing, willful, reckless, and/or intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violations.

5.  Unless otherwise indicated, the use of a Defendant's name in this Complaint includes all agents, principles, managing agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the Defendants named in this Complaint.

## JURISDICTION AND VENUE

6.  Jurisdiction of this Court is conferred by 15 U.S.C. §1681(p) and 28 U.S.C. §1331.

7.  Venue in this District is appropriate under 28 U.S.C. §1391(b).

## PARTIES

8.  Plaintiff is a natural person and a "consumer" as that term is defined by 15 U.S.C. §1681a(c).

9.  Defendant Experian Information Solutions, Inc (hereinafter "Experian"), is a For-Profit Corporation with a major processing center in the Eastern District of Texas. Experian is registered to do business in Texas and has a registered agent in Texas. Defendant is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f), and is engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined by 15 U.S.C. § 1681a(d), to third parties.

10. Defendant Equifax Information Services, LLC (hereinafter "Equifax"), is a Foreign For-Profit Limited Liability Company registered to do business in Texas and with a registered agent in Texas. Defendant is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f), and is engaged in the business of assembling, evaluating, and disbursing information concerning

consumers for the purpose of furnishing consumer reports, as defined by 15 U.S.C. § 1681a(d), to third parties. Based on information and belief, Equifax is reporting consumer credit files on over one million consumers in the Eastern District of Texas.

11. Defendant TransUnion, LLC (hereinafter "TransUnion"), is a Foreign For-Profit Limited Liability Company registered to do business in Texas and with a registered agent in Texas. Defendant is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f), and is engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined by 15 U.S.C. § 1681a(d), to third parties. Based on information and belief, TransUnion is reporting consumer credit files on over one million consumers in the Eastern District of Texas.

12. Defendant Affirm, Inc. (hereinafter "Affirm"), is a Foreign for-profit company registered to do business in Texas. Defendant is a "furnisher" of information, as defined by 15 U.S.C. §1681s(a)&(b), who regularly and in the ordinary course of business furnishes credit information to Credit Reporting Agencies about consumer transactions. Defendant is actively conducting business in the Eastern District of Texas.

13. Defendant Goldman Sachs Bank USA (hereinafter "Goldman Sachs") is a Foreign for-profit company registered to do business in Texas. Defendant is a "furnisher" of information, as defined by 15 U.S.C. §1681s(a)&(b), who regularly and in the ordinary course of business furnishes credit information to Credit Reporting Agencies about consumer transactions. Defendant is actively conducting business in the Eastern District of Texas.

## FACTUAL ALLEGATIONS

14. Plaintiff incorporates by reference all the foregoing paragraphs as though the same were set forth at length herein.

15. Plaintiff is the victim of inaccurate credit reporting.

3

16. Plaintiff is the victim of identity theft.

17. If Plaintiff is not the victim of identity theft, Plaintiff is the victim of file mixing.

18. Plaintiff initially became the victim of identity theft after a criminal used Plaintiff's personal identifying information (PII) to open Affirm accounts without Plaintiff's knowledge, authorization, or consent.

19. As a result of the identity theft, fraudulent Affirm tradelines, as well as an address not belonging to Plaintiff, began appearing on Plaintiff's credit reports.

20. In addition to the fraudulent Affirm accounts, a fraudulent Apple/Goldman Sachs account began appearing on Plaintiff's credit reports as a result of the identity theft.

21. Upon learning of the identity theft, Plaintiff contacted Affirm, informing them that the accounts were not opened by Plaintiff, however, Plaintiff was told that he would be held responsible for the accounts.

22. Plaintiff disputed the fraudulent Affirm accounts multiple times by phone. In addition to the phone disputes, Plaintiff recalls disputing the fraudulent accounts by mail on or around April 2024.

23. In response to the April 2024 dispute, Plaintiff received dispute results from Experian indicating that it had verified the fraudulent accounts as accurate and continued its inaccurate reporting of the accounts disputed by Plaintiff.

24. Despite Plaintiff's multiple attempts to have the fraudulent and inaccurate reporting corrected, the fraudulent Affirm accounts continued reporting on Plaintiff's credit reports.

25. Eventually, the fraudulent affirm account began reporting with a highly negative and derogatory "past due" status, causing further damages to Plaintiff.

26. As a result of the fraudulent accounts being reported on Plaintiff's credit reports, Plaintiff's credit scores dropped substantially, causing Plaintiff to be denied a personal loan.

27. Plaintiff later re-disputed the fraudulent accounts through dispute packages mailed directly to Experian, Equifax, and Trans Union (collectively "the Credit Reporting Agencies" or "the CRAs") via USPS Certified Mail. Plaintiff's dispute packages included a detailed and thorough dispute letter signed by Plaintiff, a copy of Plaintiff's passport, and a copy of Plaintiff's utility bill for identity verification.

28. Plaintiff's Equifax dispute package was delivered and signed for by an Equifax agent or employee on August 11, 2024.

29. Plaintiff's Experian dispute package was delivered and signed for by an Experian agent or employee on August 12, 2024.

30. Plaintiff's Trans Union dispute package was delivered and signed for by a Trans Union agent or employee on August 14, 2024.

31. On September 18, 2024, more than thirty (30) days following its receipt of Plaintiff's dispute package, Plaintiff viewed their Equifax credit report and found that the fraudulent Apple/Goldman Sachs account disputed by Plaintiff was still being reported by Equifax.

32. Also on September 18, 2024, more than thirty (30) days following its receipt of Plaintiff's dispute package, Plaintiff viewed their Experian credit report and found that the fraudulent Apple/Goldman Sachs account disputed by Plaintiff was still being reported by Experian.

33. Finally, on September 18, 2024, more than thirty (30) days following its receipt of Plaintiff's dispute package, Plaintiff viewed their Trans Union credit report and found that the fraudulent Apple/Goldman Sachs account disputed by Plaintiff was still being reported by Trans Union.

34. The following account continued reporting for more than thirty (30) days following the CRAs' receipt of Plaintiff's dispute packages:

    a.  <u>Experian:</u>

        i.  APPLE CARD/GS BANK USA       Account #1200

    b.  <u>Equifax:</u>

        i.  APPLE CARD/GS BANK USA       Account #1200

    c.  <u>Trans Union:</u>

        i.  APPLE CARD/GS BANK USA       Account #1200

35. Plaintiff thereafter obtained a police report, as well as an identity theft report from the FTC, and re-disputed the fraudulent accounts.

36. Plaintiff re-disputed the fraudulent accounts through dispute packages mailed directly to the CRAs via USPS Certified Mail. Plaintiff's second dispute packages each contained a detailed and thorough dispute letter signed by Plaintiff, a copy of Plaintiff's FTC report, a copy of Plaintiff's police report, a copy of Plaintiff's passport, and a copy of Plaintiff's utility bill for identity verification.

37. In order to further verify their identity and to aid the CRAs in their investigations into Plaintiff's disputes, each of Plaintiff's dispute letters included two (2) links to a video recorded by Plaintiff in which Plaintiff described their identity theft situation.

38. Plaintiff's second Equifax dispute package was delivered and signed for by an Equifax agent or employee on October 16, 2024.

39. Following its receipt of Plaintiff's second dispute package, Plaintiff received dispute results from Equifax indicating that the fraudulent Apple/Goldman Sachs account disputed by Plaintiff had been verified as accurate.

40. On October 22, 2024, more than four (4) business days after its receipt of Plaintiff's second dispute package, Plaintiff viewed their Equifax report and found that the fraudulent Apple/Goldman Sachs account disputed by Plaintiff was still being reported by Equifax.

41. Plaintiff's second Experian dispute package was delivered and signed for by an Experian agent or employee on October 24, 2024.

42. On October 30, 2024, more than four (4) business days after its receipt of Plaintiff's second dispute package, Plaintiff viewed their Experian report and found that the fraudulent Apple/Goldman Sachs account disputed by Plaintiff was still being reported by Experian.

43. On November 19, 2024, more than thirty (30) days after its receipt of Plaintiff's second dispute package, Plaintiff viewed their Equifax report and found that the fraudulent Apple/Goldman Sachs account disputed by Plaintiff was still being reported by Equifax.

44. On November 25, 2024, more than thirty (30) days after its receipt of Plaintiff's second dispute package, Plaintiff viewed their Experian report and found that the fraudulent Apple/Goldman Sachs account disputed by Plaintiff was still being reported by Experian.

45. Plaintiff's second Trans Union dispute package was delivered and signed for by a Trans Union agent or employee on December 26, 2024.

46. On January 6, 2025, more than four (4) business days after its receipt of Plaintiff's second dispute package, Plaintiff viewed their Trans Union report and found that the fraudulent Apple/Goldman Sachs account disputed by Plaintiff was still being reported by Trans Union.

47. On February 12, 2025, more than thirty (30) days after its receipt of Plaintiff's second dispute package, Plaintiff viewed their Trans Union report and found that the fraudulent Apple/Goldman Sachs account disputed by Plaintiff was still being reported by Trans Union.

48. The following accounts continued reporting for more than four (4) business days after the CRAs' receipt of Plaintiff's second dispute packages, in violation of the FCRA:

      a. <u>Experian:</u>

            i.   APPLE CARD/GS BANK USA      Account #1200

      b. <u>Equifax:</u>

            i.   APPLE CARD/GS BANK USA      Account #1200

      c. <u>Trans Union:</u>

            i.   APPLE CARD/GS BANK USA      Account #1200

49. The following accounts continued reporting for more than thirty (30) days after the CRAs' receipt of Plaintiff's second dispute packages, in violation of the FCRA:

      a. <u>Experian:</u>

            i.   APPLE CARD/GS BANK USA      Account #1200

      b. <u>Equifax:</u>

            i.   APPLE CARD/GS BANK USA      Account #1200

      c. <u>Trans Union:</u>

            i.   APPLE CARD/GS BANK USA      Account #1200

50. As a result of Defendants' conduct, Plaintiff has suffered damages, described in detail below.

<u>**PLAINTIFF'S DAMAGES**</u>

51. As a result of Defendants' violations of the FCRA, Plaintiff is entitled to actual, statutory, and punitive damages, along with their attorneys' fees and costs in this matter. Defendants' conduct was such that Defendants acted willfully, intentionally, recklessly, and/or negligently in their actions related to Plaintiff.

52. The conduct of the Defendants was a direct and/or proximate cause, as well as a substantial factor in bringing about injuries, damages, and harm suffered by Plaintiff. Plaintiff continues to suffer as a result of Defendants' conduct. Plaintiff expects their damages to continue to accrue and be ongoing until they are made whole again if that ever occurs.

53. Defendants, due to their conduct, are liable to compensate Plaintiff for the full amount of actual, statutory, compensatory, and punitive damages, as well as such other relief permitted by law. Plaintiff has suffered the following types of damages due to the conduct of Defendants:

 a. Emotional damages in the form of mental anguish, humiliation, and embarrassment. Plaintiff has experienced significant mental and emotional distress as a result of the identity theft, causing Plaintiff to suffer from anxiety attacks, depression, and frequent crying. As a result of Defendants' conduct, Plaintiff has also struggled with severe anxiety, affecting Plaintiff's decision making and everyday life. Plaintiff's emotional distress has been so severe that it has caused tension in Plaintiff's close personal relationships, including those with Plaintiff's mother, girlfriend, best friend, and coworkers.

 b. Physical manifestations of mental anguish, humiliation, and embarrassment. Plaintiff's mental anguish has manifested in various physical symptoms, including frequent and recurring loss of sleep, night terrors, migraines, and hair and weight loss. Plaintiff has also suffered from neck nausea, neck and back pain, and fatigue as a result of Defendants' conduct. Plaintiff has sought medical treatment for their physical symptoms and takes medication to alleviate their symptoms.

c.    Financial damages, including damages to Plaintiff's creditworthiness, credit reputation, and borrowing power. As a result of Defendants' conduct, Plaintiff's credit has been severely damaged, causing Plaintiff's credit score to drop by dozens of points and leading to credit denials and difficulty finding employment and housing. Plaintiff's debt-to-income ratio has been affected as a result of the identity theft, causing further damage to Plaintiff. Due to their damaged credit, Plaintiff had to move in with their mother. Overall, Plaintiff feels as though the identity theft and Defendants' subsequent inaccurate reporting has delayed Plaintiff's wealth-building efforts and caused significant difficulties in Plaintiff's financial stability.

54. Plaintiff's damages caused by and through the conduct of Defendants are more generally described as follows:

a.    Emotional damages in the form of mental anguish, humiliation, embarrassment, depression, and anxiety.

b.    Physical manifestations of stress and anxiety, including loss of sleep, migraines, weight loss, neck and back pain, and fatigue.

c.    Financial damages, including damage to Plaintiff's credit score, creditworthiness, credit reputation, borrowing power, and debt-to-income ratio, causing Plaintiff to be denied credit.

d.    All other damages as described above.

55. Plaintiff's damages attributable to Defendants are serious, continuing, and ongoing.

56. Defendants' actions have led to Plaintiff's great detriment and loss and are caused by the conduct of Defendants described herein.

## CAUSES OF ACTION

57. Plaintiff incorporates by reference the foregoing paragraphs as though the same were set forth at length herein.

58. This suit is based upon the Defendants' violations of the Fair Credit Reporting Act (FCRA). All causes of action were the producing causes of damages which Plaintiff has suffered.

## VIOLATIONS OF THE FAIR CREDIT REPORTNG ACT (FCRA)

59. Plaintiff incorporates by reference the foregoing paragraphs and as though the same were set forth at length herein.

60. The FCRA defines a "Consumer Reporting Agency" as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

61. Defendants Experian, Equifax, and Trans Union are Consumer Reporting Agencies pursuant to the FCRA and will collectively be referred to as "the CRAs," or "the CRA Defendants."

62. The FCRA defines a "Person" as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b).

63. The Code of Federal Regulations defines a "Furnisher" as "an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report." 12 CFR § 1022.41(c).

64. Defendants Goldman Sachs and Affirm are "Persons" pursuant to the FCRA, and "Furnisher" pursuant to the Code of Federal Regulations (CFR) and will be referred to as "the Data Furnisher" or "the Data Furnisher Defendant."

65. The following conduct of the CRAs and the Data Furnishers was a direct and/or proximate cause, as well as a substantial factor in, and/or producing cause bringing about the serious injuries, damages, and harm that Plaintiff has suffered and continues to suffer as of the filing of this Complaint. Plaintiff expects their damages caused by the CRAs and the Data Furnishers to continue to accrue and be ongoing until Plaintiff is made whole again.

66. The CRAs and the Data Furnishers, as defined above, acted in a manner that was willful, intentional, reckless, and/or negligent in their actions related to Plaintiff. As a result of these Defendants' violations of the FCRA, which are listed below, Plaintiff is entitled to actual, statutory, and punitive damages along with their attorneys' fees and costs in this matter.

67. Plaintiff's damages attributable to the CRAs and the Data Furnishers are described in detail in paragraphs 51-56 above.

68. Plaintiff's damages attributable to the CRAs and the Data Furnisher are serious, continuing, and ongoing.

69. This suit is brought against the Defendants for violations of the FCRA which are the causes of Plaintiff's damages. In all instances of violating the FCRA, Defendants did so willfully, intentionally, recklessly, and/or negligently. Plaintiff is entitled to recover actual damages, punitive damages, and reasonable attorneys' fees under 15 U.S.C. §1681n and §1681o.

<u>**COUNT I:**</u>
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(Defendants Experian, Equifax, and Trans Union)**

70. Plaintiff incorporates by reference the foregoing paragraphs and as though the same were set forth at length herein.

71. The FCRA provides that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

72. The CRAs maintained fraudulent and inaccurate information about Plaintiff and prepared credit reports regarding Plaintiff containing fraudulent information.

73. Despite actual and implied knowledge that Plaintiff was the victim of identity theft, the CRAs readily stored, prepared, reported, and/or sold reports containing fraudulent and inaccurate information about Plaintiff, and in doing so, the CRAs suggested that Plaintiff was responsible for accounts and information that was the product of identity theft.

74. The CRAs' conduct as to Plaintiff was such that a third party who viewed Plaintiff's credit reports could reasonably infer that the fraudulent and inaccurate information being reported by the CRAs was accurate, to Plaintiff's great detriment.

75. The CRA Defendants violated 15 U.S.C. § 1681e(b) by failing to establish and follow reasonable procedures to assure maximum possible accuracy in the preparation of credit files and/or reports they maintained and published about Plaintiff.

76. Had the CRAs established and/or followed reasonable procedures to assure maximum possible accuracy of their credit files and/or reports concerning Plaintiff, the CRAs would have known that the information being reported about Plaintiff was fraudulent and inaccurate.

77. Plaintiff disputed the fraudulent and inaccurate accounts multiple times by phone, over the internet, and through dispute packages mailed directly to the CRAs via USPS certified mail. In these dispute packages, Plaintiff expressly informed the CRAs that Plaintiff was the victim of

identity theft and that the disputed account information did not belong to Plaintiff. Plaintiff instructed the CRAs not to rely on the Data Furnishers for accurate information about their credit and to conduct independent investigations into Plaintiff's disputes.

78. Had the CRAs established and/or followed reasonable procedures to assure maximum possible accuracy of their credit files and/or reports concerning Plaintiff, the CRAs would have deleted and/or blocked the reporting of the fraudulent and inaccurate information after being put on notice of the identity theft from Plaintiff's dispute packages.

<u>**COUNT II:**</u>
**15 U.S.C. § 1681i(a)(1)(A)**
**Failure to Conduct a Reasonable Investigation into Plaintiff's Dispute**
**(Defendants Experian, Equifax, and Trans Union)**

79. Plaintiff incorporates by reference the foregoing paragraphs and as though the same were set forth at length herein.

80. The FCRA provides:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file…. before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

> 15 U.S.C. § 1681i(a)(1)(A).

81. Plaintiff disputed the fraudulent and inaccurate accounts multiple times by phone, over the internet, and through dispute packages mailed directly to the CRAs via USPS certified mail.

82. Plaintiff's first dispute packages each contained a detailed and thorough dispute letter signed by Plaintiff, a copy of Plaintiff's passport, and a copy of Plaintiff's utility bill for identity verification.

14

83. Plaintiff's second dispute packages each contained a detailed and thorough dispute letter signed by Plaintiff, a copy of Plaintiff's police report, a copy of Plaintiff's FTC report, a copy of Plaintiff's passport, and a copy of Plaintiff's utility bill for identity verification.

84. In order to further verify their identity and to aid the CRAs in their investigations into Plaintiff's second disputes, Plaintiff's second dispute letters each included two (2) links to a video recorded by Plaintiff in which Plaintiff explained their identity theft situation.

85. Plaintiff's dispute packages each contained more than enough information for the CRAs to investigate and find that Plaintiff was, in fact, the victim of identity theft, and that the fraudulent and inaccurate accounts had been placed on Plaintiff's credit reports as a result of identity theft.

86. After Plaintiff verified that their dispute packages had been delivered to the CRAs by USPS, Plaintiff waited more than thirty (30) days before viewing their credit reports following their dispute.

87. After pulling new credit reports, Plaintiff found that the disputed accounts remained on their credit reports following the CRAs' processing of Plaintiff's disputes, in violation of 15 U.S.C. § 1681i(a)(1)(A).

88. Plaintiff provided the CRAs with ample information proving that the disputed accounts were the product of identity theft. Had the CRAs conducted reasonable investigations in accordance with the requirements imposed by the FCRA, they would have deleted the items from Plaintiff's credit file before the end of the thirty (30) day period.

### COUNT III:
### 15 U.S.C. § 1681i(a)(4)
### Failure to Read and Consider Documents Attached to Plaintiff's Dispute
### (Defendants Experian, Equifax, and Trans Union)

89. Plaintiff incorporates by reference the foregoing paragraphs and as though the same were set forth at length herein.

90. The FCRA provides that "[i]n conducting any reinvestigation under [15 U.S.C. § 1681i(a)(1)], with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer in the [30-day] period described in [15 U.S.C. § 1681i(a)(1)(A)] with respect to such disputed information." 15 U.S.C. § 1681i(a)(4).

91. Plaintiff disputed the fraudulent and inaccurate accounts multiple times by phone, over the internet, and through dispute packages mailed directly to the CRAs via USPS certified mail.

92. Plaintiff's first dispute packages each contained a detailed and thorough dispute letter signed by Plaintiff, a copy of Plaintiff's passport, and a copy of Plaintiff's utility bill for identity verification.

93. Plaintiff's second dispute packages each contained a detailed and thorough dispute letter signed by Plaintiff, a copy of Plaintiff's police report, a copy of Plaintiff's FTC report, a copy of Plaintiff's passport, and a copy of Plaintiff's utility bill for identity verification.

94. In order to further verify their identity and to aid the CRAs in their investigations into Plaintiff's second disputes, Plaintiff's second dispute letters each included two (2) links to a video recorded by Plaintiff in which Plaintiff explained their identity theft situation.

95. Plaintiff's dispute packages each contained more than enough information for the CRAs to investigate and find that Plaintiff was, in fact, the victim of identity theft, and that the fraudulent and inaccurate accounts had been placed on Plaintiff's credit reports as a result of identity theft.

96. Plaintiff, through their dispute packages, provided the CRAs with documents sufficient to prove that Plaintiff was the victim of identity theft, however, the CRAs failed to review and consider all relevant documents submitted by Plaintiff, in violation of 15 U.S.C. § 1681i(a)(4).

97. Had the CRAs acted in accordance with the investigation requirements imposed by the FCRA and reviewed and considered each document contained in Plaintiff's dispute packages, it would have been easy for the CRAs to determine that Plaintiff was the victim of identity theft and to delete and/or suppress the disputed information accordingly.

### COUNT IV:
### 15 U.S.C. § 1681i(a)(5)(A)
### Failure to Delete and/or Modify the Disputed Information
### (Defendants Experian, Equifax, and Trans Union)

98. Plaintiff incorporates by reference the foregoing paragraphs and as though the same were set forth at length herein.

99. The FCRA provides that:

> (5) Treatment of Inaccurate or Unverifiable Information
>
> (A) *In general*. If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall-
>
> (i)  promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and
>
> (ii)  promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer

15 U.S.C. §1681i(a)(5)(A).

100.    Plaintiff disputed the fraudulent and inaccurate accounts multiple times by phone, over the internet, and through dispute packages mailed directly to the CRAs via USPS certified mail.

101.    Plaintiff's first dispute packages each contained a detailed and thorough dispute letter signed by Plaintiff, a copy of Plaintiff's passport, and a copy of Plaintiff's utility bill for identity verification.

102.    Plaintiff's second dispute packages each contained a detailed and thorough dispute letter signed by Plaintiff, a copy of Plaintiff's police report, a copy of Plaintiff's FTC report, a copy of Plaintiff's passport, and a copy of Plaintiff's utility bill for identity verification.

103.    In order to further verify their identity and to aid the CRAs in their investigations into Plaintiff's second disputes, Plaintiff's second dispute letters each included two (2) links to a video recorded by Plaintiff in which Plaintiff explained their identity theft situation.

104.    Plaintiff's dispute packages each contained more than enough information for the CRAs to investigate and find that Plaintiff was, in fact, the victim of identity theft, and that the fraudulent and inaccurate accounts had been placed on Plaintiff's credit reports as a result of identity theft, yet the CRAs failed to delete fraudulent and inaccurate information disputed by Plaintiff.

105.    After pulling new credit reports following their disputes, Plaintiff found that the CRAs continued reporting the fraudulent and inaccurate accounts disputed by Plaintiff, in violation of the FCRA.

106.    The CRAs violated their duty under 15 U.S.C. §1681i(a)(5)(A) by failing to promptly delete the disputed information from Plaintiff's credit files and/or credit reports.

107.    Had the CRAs conducted reasonable investigations into Plaintiff's disputes as required by statute, they would have easily found that Plaintiff was the victim of identity theft and promptly deleted the disputed items from Plaintiff's credit files and/or credit reports in accordance

with the FCRA. Instead, the CRAs continued their inaccurate credit reporting about Plaintiff, to Plaintiff's great detriment.

**COUNT V:**
**15 U.S.C. § 1681c-2(a)**
**Failure to Block the Reporting of Identity Theft Information within Four (4) Business Days**
**(Defendants Experian, Equifax, and Trans Union)**

108.      Plaintiff incorporates by reference the foregoing paragraphs and as though the same were set forth at length herein.

109.      The FCRA provides the following:

[A] consumer reporting agency shall block the reporting of any information in the file of a consumer that the consumer identities as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such agency of—

(1) appropriate proof of identity of the consumer;

(2) a copy of an identity theft report;

(3) the identification of such information by the consumer; and

(4) a statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a).

110.      After Plaintiff discovered the fraudulent and inaccurate accounts appearing on their credit reports, Plaintiff disputed the accounts through dispute packages mailed directly to the CRAs via USPS certified mail.

111.      Plaintiff disputed the fraudulent and inaccurate accounts multiple times by phone, over the internet, and through dispute packages mailed directly to the CRAs via USPS certified mail.

112.     Plaintiff's second dispute packages each contained a detailed and thorough dispute letter signed by Plaintiff, a copy of Plaintiff's police report, a copy of Plaintiff's FTC report, a copy of Plaintiff's passport, and a copy of Plaintiff's utility bill for identity verification.

113.     In order to further verify their identity and to aid the CRAs in their investigations into Plaintiff's second disputes, Plaintiff's second dispute letters each included two (2) links to a video recorded by Plaintiff in which Plaintiff explained their identity theft situation.

114.     After pulling new credit reports more than four (4) business days following the delivery of Plaintiff's dispute packages, Plaintiff found that the CRAs had continued reporting the fraudulent and inaccurate accounts on Plaintiff's credit reports in violation of the FCRA.

115.     The CRAs violated 15 U.S.C. § 1681c-2(a) when, based on information and belief, they failed to block the reporting of information in Plaintiff's consumer file that Plaintiff identified as having resulted from an alleged identity theft within four (4) days of receipt of proof of identity, a copy of Plaintiff's identity theft report, identification of identity theft-related information, and Plaintiff's statement that the fraudulent and inaccurate accounts were the product of identity theft.

116.     Had the CRAs acted in accordance with their duties under the FCRA, the CRAs would have blocked the reporting of the fraudulent and inaccurate accounts identified by Plaintiff as resulting from identity theft within four (4) days of receipt of Plaintiff's dispute packages.

## COUNT VI:
### 15 U.S.C. § 1681s-2(b)
### Failure to Conduct a Reasonable Investigation of the Information Disputed by Plaintiff
### (Defendants Affirm and Goldman Sachs)

117.     Plaintiff incorporates by reference the foregoing paragraphs and as though the same were set forth at length herein.

118.     The FCRA provides the following:

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall –

(A)    Conduct an investigation with respect to the disputed information;

(B)    Review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C)    Report the results of the investigation to the consumer reporting agency;

(D)    If the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E)    If an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—

(i)     Modify that item of information;
(ii)    Deleted that item of information; or
(iii)   Permanently block the reporting of that information.

15 U.S.C. § 1681s-2(b).

119.    The Data Furnishers furnished information about fraudulent and inaccurate accounts that were the product of identity theft to the Credit Reporting Agencies.

120.    The Data Furnishers caused fraudulent and inaccurate accounts to be added to Plaintiff's credit files with the Credit Reporting Agencies.

121.     On information and belief, notice of Plaintiff's disputes and attachments were transmitted to the Data Furnishers by the CRAs during the dispute process. Therefore, the Data Furnishers were aware that the disputed accounts did not belong to Plaintiff and still verified the disputed accounts as accurate and instructed the CRAs to continue reporting the inaccurate information, to the great detriment of Plaintiff.

122.    The Data Furnishers failed to conduct reasonable, good faith investigations into Plaintiff's notices of dispute.

123.    Had the Data Furnishers acted in accordance with their duties under 15 U.S.C. § 1681s-2(b), the Data Furnishers would have recognized that the disputed accounts were the product of identity theft and instructed the CRAs to cease their reporting of the fraudulent and inaccurate accounts. Instead, the Data Furnishers verified disputed accounts as accurate and instructed the CRAs to continue their reporting of the fraudulent and inaccurate accounts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a trial by jury and a judgment in Plaintiff's favor against Defendants based on the following requested relief:

a.  Actual and compensatory damages pursuant to 15 U.S.C. § 1681;

b.  Statutory damages pursuant to 15 U.S.C. § 1681;

c.  Punitive damages pursuant to 15 U.S.C. § 1681;

d.  Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o,

e.  Such other and further relief as may be necessary, just and proper.


Dated: May 6, 2025

                Respectfully Submitted,


                        /s/Kyle Kaufman
                        Kyle Kaufman
                        ATTORNEY FOR PLAINTIFF
                        Louisiana Bar Roll No. 39232
                        Raburn Kaufman, LLC
                        8570 Anselmo Lane
                        Baton Rouge, Louisiana 70810
                        kkaufman@raburnkaufman.com
                        Telephone: 225-412-2777

/s/Jonathan Raburn
Jonathan Raburn
ATTORNEY FOR PLAINTIFF
Louisiana Bar Roll No. 28728
Raburn Kaufman, LLC
8570 Anselmo Lane
Baton Rouge, Louisiana 70810
jraburn@raburnkaufman.com
Telephone: 225-412-2777